STATE OF NEBRASKA, APPELLEE, V.
MICHAEL ANTHONY MATTHEWS, APPELLANT.
590 N.W. 2d 402

Filed February 16, 1999.   No. A-98-055.

Sanford J. Pollack for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

IRWIN, Chief Judge, and SIEVERS and INBODY, Judges.

INBODY, Judge.

## I. INTRODUCTION

Michael Anthony Matthews appeals his convictions for two counts of robbery, arguing that (1) the district court erred in overruling his motion to suppress, (2) the district court erred in overruling his motion for a change of venue, (3) he received ineffective assistance of counsel, (4) the evidence was insuffi-

cient to support his convictions, and (5) the trial court erred in denying his oral motion to continue the trial. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

On September 12, 1996, between 7 and 7:30 p.m., 74-year-old Vera Moss was watching television when she heard a knock on her apartment door in Lincoln, Lancaster County, Nebraska. When Moss opened the door, a black man wearing a blue or white shirt, blue shorts, and white tennis shoes asked for a person by a name that Moss did not recognize. Moss responded that she did not know anyone by that name. The man, standing just inside of Moss' front door, then asked if he could have a drink of water. Moss brought a glass of water to the man, who proceeded to drink it. The man then put his hand on Moss' shoulder and pushed her down. At that time, Moss' roommate came out of the bedroom, apparently frightening the man, because the man "ran off." Moss and her roommate identified Matthews as the man who entered the apartment on September 12.

On September 16, 1996, at around 4 p.m., Frieda Sieck, age 79, was returning from a grocery store to her apartment in Lincoln. As Sieck started to unlock her door, a large black man wearing jeans and a blue and white shirt came up to her and asked her for a drink. Sieck responded that she did not have any and finished unlocking her door. At that point, the man pushed his way into her apartment. Sieck fell down, and the man put one arm around her neck and said he wanted money. The man left after taking $4 out of Sieck's purse.

On that afternoon, Officer Vadra Stutzman was on patrol in southwest Lincoln. At approximately 5 p.m., she observed a black male wearing black jeans and a blue and white shirt walking out of the alley from behind 1215 G Street, which was directly south of Sieck's apartment building. As Officer Stutzman passed the man in her patrol car, he began running across the street. At 11th and E Streets, Officer Stutzman contacted the man, who was sweating and breathing heavily. The man identified himself as "Michael Matthews." Upon patting Matthews down for officer safety, Officer Stutzman found $4 in Matthews' rear pocket. Officer Stutzman then transported Matthews to Sieck's apartment building for Sieck to identify

him. Although Sieck was able to state that he was wearing clothing similar to the person who robbed her, she was not able to positively identify Matthews.

On September 16, 1996, Officer Alvin Banks was investigating the robbery of Sieck when he came into contact with Matthews. Officer Banks asked Matthews to accompany him to the Lincoln Police Department, and Matthews complied. During the advisement of *Miranda* rights, Matthews responded affirmatively when asked if he understood that he had the right to remain silent and not to make any statements or answer any of the officer's questions. However, when Officer Banks told Matthews that "[a]nything you say can be and will be held against you in a court of law, do you understand that?" Matthews responded, "I'm through talking then." Officer Banks then said, "Okay. You don't want to continue any further?" Matthews said, "I told you already what happened three or four times, so . . . ." At that point, Officer Banks terminated the interview.

On September 25, 1996, between 3:30 and 4 p.m., Jean Barber returned home to a duplex in Lincoln that she shared with her husband. Barber unlocked the doors, put her purse on a chair, sat in another chair, and began to read, waiting for her husband, who was to return momentarily. It was a nice day, so Barber had left the inside door open and the storm door unlocked. As Barber was sitting in the chair reading, a person opened the storm door, stuck his head in, and said, "[I]s Ms. Parsons home[?]" Barber got up out of her chair and said, "[O]h no, they don't live here anymore, they moved." The man pulled the door open a little more, came inside, and grabbed both of Barber's wrists with one hand, used the other hand to cover Barber's mouth, and said, "I want your money." At that point, the intruder saw Barber's purse, a "light brown hobo bag," on the chair. The man grabbed the purse and ran out the door, running toward Woodbine Avenue. Barber had over $1,000 cash in her purse, along with $300 in gold coins and $350 in traveler's checks. Barber described the man as black, medium height, medium build, but "maybe a little on the stocky side," in his twenties, "a growth of beard on his face," and short hair. He was wearing a blue and black plaid shirt, jeans, and sneakers.

That same day, between 3:45 and 4:15 p.m., 11-year-old Dan Warner Keefe, who lived on Woodbine Avenue, was sitting at the dining room table looking out the window onto Woodbine Avenue when he saw a black male running while carrying a purse. Keefe later told police that he saw the black man run to a car that was beige or tan with stripes painted on the side. Keefe identified Matthews' girl friend's car as the car that he saw on September 25.

On September 27, 1996, at 6 p.m., Officer Jeffrey Howard and several other officers served a search warrant on Matthews' residence at 1328 Garfield in Lincoln. Matthews followed Officer Howard from room to room during the search and attempted to have a conversation with him. Before talking with Matthews, Officer Howard read Matthews his *Miranda* rights, which Matthews waived. Officer Howard then told Matthews that he was investigating a robbery that occurred in southeast Lincoln and told Matthews what items he was looking for. Matthews informed Officer Howard that he would not find any of those things in the house. After completing the search, in which officers seized a pair of blue gym shorts and three flannel shirts, Officer Howard asked Matthews if he would be willing to accompany Officer Howard to the police station so Officer Howard could ask him some questions and talk to him in more depth about the case. Matthews said that he would be willing and accompanied Officer Howard to the police station in Officer Howard's cruiser.

While at the police station, officers made a videotape of Matthews saying key phrases that had been used in each of the three robberies. Additionally, an interview of Matthews was conducted. During the interview, Matthews stated that "he didn't have anything to do with any of [the robberies], that the victims were mistaken if they were saying that he had anything to do with them." Further, Matthews denied that he had been driving his girl friend's gray Ford Tempo, which had distinctive paint markings on the sides of the vehicle, in the area of South 39th Street and Woodbine Avenue on the date of the Barber robbery. At this time, an appointment was made for Matthews to take a polygraph examination on September 28, 1996. Follow-

ing the interview, officers provided Matthews with a ride back to his residence.

On September 28, 1996, Matthews went to the police station to inform Officer Howard that he could not take the polygraph at the scheduled time. After the polygraph was rescheduled for October 1, Matthews told Officer Howard that he might know parties who were selling stolen goods from the robberies which Officer Howard was investigating.

On October 1, 1996, Matthews drove himself to the police station for his rescheduled polygraph test. Matthews waived his *Miranda* rights. After the polygraph examination, Matthews asked Officer Howard that if Matthews would be willing to pay back the $2,000, would he be left alone regarding the investigation and not have to go to jail. Matthews then stated that his girl friend's car was not the vehicle that would have been used in the Barber robbery. Further, Matthews stated that he might be able to get back the gold coins which had been stolen in the Barber robbery. Finally, Matthews told Officer Howard that he thought he knew who committed the robberies, but did not want to tell Officer Howard. Matthews indicated that he would be willing to take the fall for someone else because he did not want to see anybody else get into trouble. Following the conclusion of the examination, Matthews was allowed to leave.

On October 12, 1996, Officer Howard contacted Matthews concerning what progress Matthews was making on recovering the stolen gold coins. Later that day, Officer Howard arrested Matthews for the attempted robbery of Moss and the robberies of Barber and Sieck.

On October 25, 1996, an information was filed in Lancaster County District Court charging Matthews with three counts: (1) the September 12 attempted robbery, (2) the September 16 robbery, and (3) the September 25 robbery.

On December 6, 1996, Matthews moved to suppress evidence obtained as a result of the September 27 search of his residence and to suppress all of his statements to police. Amended motions to suppress were filed on December 24 more specifically setting forth the particular statements sought to be suppressed and the alleged illegalities surrounding the search of

Matthews' residence supporting suppression of the items seized by law enforcement officers.

A hearing on Matthews' motions to suppress was held on January 9, 1997. In an order filed May 1, the district court overruled Matthews' amended motions to suppress, finding that the September 27, 1996, search of Matthews' residence was conducted pursuant to a valid search warrant. Matthews' motion to suppress his September 16 statements was sustained because Matthews had exercised his right to remain silent and did not make any statements. The court held that both of Matthews' September 27 and October 1 statements were admissible at trial because Matthews was not in custody on either date and, on both dates, had waived his *Miranda* rights freely, voluntarily, and knowingly. The court further held that Matthews' October 12 conversation with police regarding his actions in getting the gold coins back is admissible because Matthews was not in custody and entered into the conversation freely, voluntarily, and knowingly.

On October 28, 1997, Matthews requested that the trial be continued so that he could locate some witnesses whom he believed would be beneficial to his case. However, Matthews did not have the names and addresses of those witnesses and had not been able to determine this information even though he had been attempting to do so since the beginning of the case. Matthews' motion to continue was denied, and the jury trial commenced the following day. The jury found Matthews not guilty of count I, attempted burglary, but convicted him of counts II and III, robbery. Matthews was sentenced to 5 to 10 years' imprisonment for each of the robbery convictions. The sentences were ordered to run consecutively, and Matthews was given credit for 424 days previously served. Matthews timely appeals to this court.

## III. ASSIGNMENTS OF ERROR

On appeal, Matthews contends that the district court erred (1) in overruling his motion to suppress statements and (2) in overruling his motion for a change of venue. He further contends that (3) he received ineffective assistance of counsel, (4) the evidence was insufficient to support his convictions, and (5) the trial court erred in denying his motion to continue.

## IV. DISCUSSION

### 1. MOTION TO SUPPRESS

First, we address Matthews' assigned error that the district court erred in overruling his motion to suppress statements obtained in violation of his constitutional rights. Specifically, Matthews claims that police officers violated his Fifth Amendment rights by questioning him after he had invoked his *Miranda* right to remain silent and right to counsel on September 16, 1996.

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Merrill,* 252 Neb. 510, 563 N.W.2d 340 (1997); *State v. Beeken,* 7 Neb. App. 438, 585 N.W.2d 865 (1998). In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Chitty,* 253 Neb. 753, 571 N.W.2d 794 (1998); *State v. Beeken, supra.*

### (a) Violation of Right to Counsel

First, we address Matthews' claim that his conversations with police after September 16, 1996, were conducted after invocation of his *Miranda* right to counsel and thus violated his constitutional rights and should have been suppressed. Conversely, the State contends that the record does not reflect that Matthews invoked his right to counsel under *Miranda* on September 16. Thus, the preliminary issue which faces this court is whether Matthews did in fact invoke his *Miranda* right to counsel on September 16.

The U.S. Supreme Court has held that "[t]o protect the privilege against self-incrimination guaranteed by the Fifth Amendment . . . the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." *Minnick v. Mississippi,* 498 U.S. 146, 147, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990) (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Accord

*State v. Smith,* 242 Neb. 296, 494 N.W.2d 558 (1993). The Court strengthened the protection of *Miranda* in *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), where it held that, under *Miranda,* if the accused requests counsel, the interrogation must cease until an attorney is present.

More recently, in *Davis v. United States,* 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the U.S. Supreme Court held that invocation of the *Miranda* right to counsel requires that a suspect "unambiguously request counsel." *Davis v. United States,* 512 U.S. at 459. This means that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* See, also, *State v. Greybull,* 579 N.W.2d 161, 162 (N.D. 1998) (North Dakota Supreme Court held that accused's question " 'Do I have to get a lawyer? Do I need to get a lawyer . . . .' " was not unequivocal invocation of her right to counsel required by *Davis v. United States, supra*); *State v. Morgan,* 559 N.W.2d 603, 607 (Iowa 1997) (defendant's statement, " 'I think I need an attorney,' " was not unambiguous request for counsel required by *Davis v. United States, supra,* and was therefore insufficient to invoke *Miranda* right to counsel); *State v. Harris,* 199 Wis. 2d 227, 544 N.W.2d 545 (1996) (defendant's statements to police obtained following his unambiguous request for counsel must be suppressed); *People v Granderson,* 212 Mich. App. 673, 538 N.W.2d 471 (1995) (Michigan Court of Appeals held that defendant's statement, at best, could only be considered to be ambiguous request for counsel which need not be suppressed under *Davis v. United States, supra*).

In the instant case, on September 16, 1996, during the advisement of *Miranda* rights, Matthews responded affirmatively when asked if he understood that he had the right to remain silent and not to make any statements or answer any of the officer's questions. However, when Officer Banks told Matthews that "[a]nything you say can be and will be held against you in a court of law, do you understand that?" Matthews responded, "I'm through talking then." Officer Banks then said, "Okay. You don't want to continue any further?" Matthews said, "I told you

already what happened three or four times, so . . . ." At that point, Officer Banks terminated the interview.

The record is clear that Matthews did not affirmatively request an attorney at any point during the interview on September 16, 1996. Further, at the point in time that Matthews invoked his rights, Officer Banks had not yet even advised Matthews of his right to an attorney. Thus, it seems clear from the record that Matthews' invocation of *Miranda* on September 16 was limited to an invocation of his *Miranda* right to remain silent.

### (b) Violation of Right to Remain Silent

Next, we address Matthews' claim that the trial court erred in overruling his motion to suppress statements made after September 16, 1996, because Matthews' invocation of his right to remain silent was not "scrupulously honored." Brief for appellant at 19.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court held that the Fifth Amendment protection of the privilege against self-incrimination requires that individuals be given certain warnings regarding their rights and that a voluntary, knowing, and intelligent waiver of those rights must be made before incriminating responses to custodial interrogation can be admissible in a criminal proceeding. *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996); *State v. McCurry*, 5 Neb. App. 526, 561 N.W.2d 244 (1997). See, also, *State v. Veiman*, 249 Neb. 875, 546 N.W.2d 785 (1996).

After *Miranda*, the U.S. Supreme Court decided *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), in which the Court considered the admissibility of a defendant's statements made after the defendant had expressed his unwillingness to answer police questions about the robberies under investigation. Approximately 2 hours after invoking his right to remain silent, Mosley was questioned about a homicide, which was unrelated to the robberies which were the subject of the initial questioning. A police officer who had not participated in Mosley's initial interrogation advised Mosley of his *Miranda* rights, after which Mosley made a statement implicating himself in the homicide.

■ In determining that Mosley's statements were not obtained in violation of his right to remain silent, the U.S. Supreme Court held that the admissibility of statements obtained after the person in custody has decided to remain silent under *Miranda* depends on whether the accused's " 'right to cut off questioning' " was " 'scrupulously honored.' " 423 U.S. at 104. However, in so determining, the Court also stated that the *Miranda* opinion could not "sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." 423 U.S. at 102-03.

■ In view of *Michigan v. Mosley, supra*, the Nebraska Supreme Court has held that

> after a defendant has invoked the right to be silent and terminate custodial interrogation by police, but there is subsequent police interrogation of the defendant, a court considers three factors to determine whether a defendant's right to be silent has been scrupulously honored, namely: (1) Did the police immediately cease interrogation on the defendant's request? (2) Did the police resume an interrogation of the defendant only after passage of a significant time and a renewal of the *Miranda* warning? and (3) Did police restrict the subsequent interrogation to a transaction or occurrence which was not the subject of the prior interrogation which was discontinued?

*State v. Pettit*, 227 Neb. 218, 230, 417 N.W.2d 3, 11 (1987).

Applying these factors to the case at bar, it is clear from the record that when Matthews invoked his right to remain silent on September 16, 1996, the interrogation ceased immediately, and Matthews was allowed to leave. Second, Matthews' next conversation with police occurred on September 27. On this particular date, Matthews initiated a conversation with law enforcement officers while they were executing a search warrant of his house. Additionally, we note that when Matthews initiated the conversation with Officer Howard, Matthews was not in custody. Further, Officer Howard again warned Matthews of his *Miranda* rights, which Matthews then waived freely, voluntarily, and knowingly. On Matthews' subsequent contacts with police on September 28 and October 1 and 12, Matthews was

not in custody when the statements were made, and the statements were made voluntarily. Since Matthews' statements were voluntarily given, the third criterion set forth in *State v. Pettit, supra*, is inapplicable. See *State v. Lee*, 227 Neb. 277, 417 N.W.2d 26 (1987).

In sum, on the facts of this case, we cannot say that the trial court's ruling on Matthews' motions to suppress was clearly erroneous. Consequently, this assigned error is without merit.

## 2. CHANGE OF VENUE

Matthews' second assigned error is that the district court erred in overruling his motion for a change of venue.

Neb. Rev. Stat. § 29-1301 (Reissue 1995) provides:

> All criminal cases shall be tried in the county where the offense was committed, except as otherwise provided in section 25-412.03 or sections 29-1301.01 to 29-1301.03, or unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein. In such case the court, upon motion of the defendant, shall transfer the proceeding to any other district or county in the state as determined by the court.

A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of that discretion. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995). A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial. *State v. Jacob, supra; State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). See *State v. McHenry, supra*.

Matthews makes assertions in his brief regarding the reasons underlying his motion for a change of venue. However, he makes no citations to the record to support those assertions. Although the record discloses that Matthews filed a motion for change of venue that was heard and denied on August 22, 1997, the record does not include the motion itself, nor does the bill of exceptions include the August 22 hearing on the motion for a change of venue.

It is incumbent upon the party appealing to present a record which supports the errors assigned; absent such a record,

as a general rule, the decision of the lower court is to be affirmed. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994). Because Matthews has not provided this court with a record which supports this assigned error, we necessarily conclude that the district court did not abuse its discretion in denying his motion for a change of venue.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Matthews' third assigned error is that he received ineffective assistance of counsel because trial counsel refused to investigate his claim that surveillance tapes from a convenience store would show that Matthews was in that store at the time of the September 16, 1997, robbery of Sieck.

In order to state a claim of ineffective assistance of counsel as violative of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that his or her counsel's performance was deficient and that such deficient performance prejudiced the defendant, that is, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Boppre*, 252 Neb. 935, 567 N.W.2d 149 (1997), *disapproved on other grounds, State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998); *State v. Massey*, 252 Neb. 426, 562 N.W.2d 542 (1997); *State v. Thomas*, 6 Neb. App. 510, 574 N.W.2d 542 (1998). See, also, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Claims of ineffective assistance of counsel raised for the first time on direct appeal, as is the case here, do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. See *State v. Thomas, supra.* See, also, *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995); *State v. Dawn*, 246 Neb. 384, 519 N.W.2d 249 (1994). An appellate court will not address a matter on direct appeal when the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing. *State v. Dawn, supra*; *State v. Thomas, supra.*

The issue of ineffective assistance of counsel was not raised before the trial court, and the record before this court on appeal

is insufficient to adequately review the question of effectiveness of Matthews' trial counsel. Therefore, we do not reach Matthews' claims of ineffective assistance of counsel on this direct appeal. See *State v. Thomas, supra.*

### 4. INSUFFICIENCY OF EVIDENCE

Matthews' fourth assigned error is that the evidence was insufficient to support his convictions for robbery, charged in counts II and III of the information.

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998); *State v. Butzke*, 7 Neb. App. 360, 584 N.W.2d 449 (1998).

Neb. Rev. Stat. § 28-324 (Reissue 1995) provides that "[a] person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever."

### (a) Count II - Robbery of Sieck

With regard to the September 16, 1996, robbery of Sieck, the evidence, viewed in the light most favorable to the State, was that as Sieck returned to her apartment and started to unlock the door, a large black man wearing jeans and a blue and white shirt came up to her and asked her for a drink. Sieck responded that she did not have any and finished unlocking her door. At that point, the man pushed his way into her apartment. Sieck fell down, and the man put one arm around her neck, said he wanted money, and took $4 out of Sieck's purse.

Shortly thereafter, Matthews, who was walking out of the alley from behind 1215 G Street, which was directly to the south of Sieck's apartment building, was apprehended by Officer Stutzman. Matthews was wearing black jeans and a blue and white shirt and had $4 in his back pocket. Furthermore, although Sieck could not positively identify Matthews as the man who robbed her, she was able to state that he was wearing

clothing similar to the person who robbed her. This evidence is sufficient to support Matthews' conviction of count II, the robbery of Sieck.

### (b) Count III - Robbery of Barber

With regard to the September 25, 1996, robbery of Barber, the evidence, viewed in the light most favorable to the State, was that Barber was sitting in a chair reading in the living room of her home, when a black male opened the unlocked storm door, stuck his head in, and said, "[I]s Ms. Parsons home[?]" Barber got up out of her chair and said, "[O]h no, they don't live here anymore, they moved." The man pulled the door open a little more, came inside, and grabbed both of Barber's wrists with one hand, used the other hand to cover Barber's mouth, and said, "I want your money."

At that point, he saw Barber's purse, a light brown hobo bag, on the chair. He grabbed the purse, which contained $1,000 cash, $300 in gold coins, and $350 in traveler's checks, and ran out the door. Barber described the intruder as a black man of medium height and build, but "maybe a little on the stocky side," in his twenties, with short hair and a growth of beard. The robber was wearing a blue and black plaid shirt, jeans, and sneakers. At trial, Barber positively identified Matthews as the robber.

Furthermore, Keefe testified that on September 25, 1996, between 3:45 and 4:15 p.m., he saw a black male carrying a purse running to a beige or tan car with stripes painted on the side. Keefe identified Matthews' girl friend's car as the car that he saw on September 25. The evidence further established that Matthews' girl friend's car was the only gray Ford Tempo in Lincoln that had the distinctive paint designs on the side of the vehicle. Furthermore, Matthews admitted to police that he was the only person who was driving the above-described gray Ford Tempo on September 25. This evidence is clearly sufficient to support Matthews' conviction of count III, the robbery of Barber.

### 5. MOTION TO CONTINUE

Finally, we consider Matthews' claim that the district court erred in denying his oral motion to continue the trial so that he

could locate and contact witnesses whom Matthews had been unable to identify as of that date, but whom he believed would be helpful to his defense. Although Matthews and his counsel had been working on locating and identifying these witnesses throughout the duration of the case, they did not have names and addresses of the witnesses. The district court denied the motion, stating:

> This matter has been pending for a long time. Unless you really gave me some notion that further time was really likely to produce something, which I don't hear. You don't have names and addresses and you have been working on it since the case has been pending, I see no reason to continue it beyond now and that motion will be denied.

The decision of whether to grant a continuance in a criminal case is addressed to the discretion of the trial court, and that court's ruling will not be disturbed on appeal absent an abuse of discretion. *State v. Valdez*, 239 Neb. 453, 476 N.W.2d 814 (1991); *State v. Rosales*, 3 Neb. App. 26, 521 N.W.2d 385 (1994). Additionally, there is no abuse of discretion by a court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result thereof. *State v. Valdez, supra; State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

Neb. Rev. Stat. § 29-1206 (Reissue 1995) provides:

> Applications for continuances shall be made in accordance with section 25-1148, but in criminal cases in the district court the court shall grant a continuance only upon a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecution or defense, but also the public interest in prompt disposition of the case.

Motions for continuance are governed by Neb. Rev. Stat. § 25-1148 (Reissue 1995), which provides:

> Whenever application for continuance or adjournment is made by a party or parties to any cause or proceeding pending in the district court of any county, such application shall be by written motion entitled in the cause or proceeding and setting forth the grounds upon which the application is made, which motion shall be supported by the affidavit or affidavits of person or persons competent

to testify as witnesses under the laws of this state, in proof of and setting forth the facts upon which such continuance or adjournment is asked. After the filing of such application and the affidavits in support thereof, the adverse party shall have the right to file counter affidavits in the matter. Either party may, upon obtaining leave of the court, introduce oral testimony upon the hearing of such application. The court may, upon the hearing, in its discretion, grant or refuse such application, and no reversal of such cause or proceeding shall be had on account of the action of the court in granting or refusing such application except when there has been an abuse of a sound legal discretion by the court.

In the instant case, not only was the application for continuance in this case made by oral motion, the motion was not supported by affidavits. However, the failure to comply with the provisions of § 25-1148 is but a factor to be considered in determining whether a trial court abused its discretion in denying a continuance. *State v. Santos*, 238 Neb. 25, 468 N.W.2d 613 (1991); *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990). Thus, we proceed to consider the merits of Matthews' motion to continue.

When Matthews' motion to continue was made, his case had been pending for nearly 1 year, the motion was made the day before trial, he was unable to provide the court with the names or addresses of the witnesses whom he sought to locate, and he was unable to enlighten the court concerning the nature of these witnesses' testimony, only that said testimony would be "beneficial" to Matthews' case. Matthews has not shown that even if a continuance were granted, he would be able to secure any material evidence. Thus, he has failed to show that he was in any way prejudiced by the district court's refusal to grant him a continuance, and this assigned error is without merit.

## V. CONCLUSION

We have determined that Matthews' assigned errors concerning the denial of his motions to suppress, motion for change of venue, and motion to continue and the insufficiency of the evidence to support his convictions are without merit. Further, the

record is inadequate for this court to review Matthews' claim of ineffective assistance of counsel. Therefore, Matthews' convictions and sentences are affirmed.

AFFIRMED.